UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-09-286 |
| | § | |
| CHARLES O BURNETT, III, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day came on to be considered United States of America's Motion for Summary Judgment.  (D.E. 28.)  For the reasons stated herein, United States of America's Motion for Summary Judgment is GRANTED.  (D.E. 28.)

**I.      Jurisdiction**

The Court has jurisdiction pursuant to 26 U.S.C. §§ 7402, 7403 and 28 U.S.C. §§ 1331, 1345, as this action arises under the Internal Revenue Code, and the United States is the Plaintiff.

**II.     Factual Background**

This is a civil action brought by the United States to (1) reduce to judgment federal income tax assessments against Defendant-Counter Plaintiff Charles O. Burnett III, (2) foreclose federal tax liens on real property located in Nueces County, Texas, (3) obtain a sale of such property, and (4) obtain a judgment for any amount remaining unpaid after the distribution and application of the proceeds when the subject property is sold.  (D.E. 7.)  Burnett, who originally filed a separate lawsuit that was later consolidated with this action, filed a counterclaim alleging wrongful levy pursuant to 26

U.S.C. § 7426 with respect to one property seized by the Government.  (D.E. 11.)  The Court recounts the following factual background of this case.

### A.    Alleged Tax Liabilities

The United States alleges that Burnett, a self-employed contractor, has "a long history of non-compliance with regard to federal taxes," having not paid federal income taxes since 1997.  (D.E. 28 at 3.)  As early as 1993, Mr. Burnett claimed that he was not a "taxpayer" as that term is defined by the Internal Revenue Code, and was not liable for federal taxes.  (D.E. 28-13 at 7.)  Based upon his years of alleged delinquency, the United States claims that Burnett has federal income, employment, and unemployment tax liabilities totaling $621,623.87.  (D.E. 29 at 2.)  The Declaration of IRS Revenue Officer Kevin Limerick describes Burnett's alleged tax delinquencies.  (D.E. 28-1; D.E. 29-1.)

Burnett allegedly owes the following amounts of unpaid federal income taxes, statutory additions, accrued penalties and interest as of October 31, 2009, as assessed on April 3, 2000 (D.E. 29 at 2; D.E. 29-2):

| Tax Year | Unpaid Assessed Balance | Accrued Penalties and Interest | Total |
|----------|-------------------------|-------------------------------|-------|
| 1993 | $4,026.27 | $0 | $4,026.27 |
| 1994 | $42,166.04 | $32,157.66 | $74,323.70 |
| 1995 | $62,195.79 | $47,130.23 | $109,326.02 |
| 1996 | $56,951.14 | $46,854.90 | $103,806.04 |
| 1997 | $70,935.20 | $58,357.02 | $129,292.22 |
| TOTAL | | | $ 420,774.25 |

In addition, Burnett allegedly owes the following amounts of unpaid federal employment and unemployment taxes plus penalties and interest as of October 31, 2009, as assessed November 1, 1999 (D.E. 29-3, D.E. 29-4, D.E. 29-5):

| Tax Year / Period (Type of Tax) | Unpaid Assessed Balance | Accrued Penalties and Interest | Total |
|---|---|---|---|
| 199503 (941)[1] | $2,891.66 | $2,357.26 | $5,248.92 |
| 199506 (941) | $6,355.69 | $5,187.88 | $11,543.57 |
| 199509 (941) | $7,884.37 | $6,422.71 | $14,307.08 |
| 199512 (941) | $14,266.68 | $11,598.02 | $25,864.70 |
| 199603 (941) | $6,850.62 | $5,558.22 | $12,408.84 |
| 199606 (941) | $8,054.67 | $6,522.23 | $14,576.90 |
| 199609 (941) | $10,413.33 | $8,413.93 | $18,827.26 |
| 199612 (941) | $10,754.32 | $8,670.26 | $19,424.58 |
| 199703 (941) | $7,142.38 | $5,745.77 | $12,888.15 |
| 199706 (941) | $6,342.64 | $5,090.72 | $11,433.36 |
| 199709 (941) | $8,925.48 | $7,147.05 | $16,072.53 |
| 199712 (941) | $10,952.39 | $8,749.27 | $19,701.66 |
| 199512 (940)[2] | $3,600.98 | $2,939.80 | $6,540.78 |
| 199612 (940) | $3,872.99 | $3,137.87 | $7,010.86 |
| 199712 (940) | $2,772.68 | $2,227.75 | $5,000.43 |
| **TOTAL** | | | **$200,849.62** |

On February 8, 2001, the United States recorded notice of its tax liens securing the tax liabilities listed above in the Nueces County real property records, relating to two

---

[1] Federal Employment Tax.
[2] Federal Unemployment Tax.

properties identified herein as the "Austin Street Property" and the "Holly Road Property." (D.E. 28-1 at 2; D.E. 28-3 at 1; D.E. 28-5.)  On July 5, 2007, the United States recorded notice of a nominee lien in the real property records of Nueces County, Texas, against an entity named Investment Services Trust, which the Government considered to be a nominee of Burnett. (D.E. 28 at 5.)

### B.    Investment Services Trust

The Investment Services Trust is a "Constitutional Private Free Enterprise Trust," as stated in the trust instrument.  The trust instrument states that it was entered into between "Ed Clark of San Diego County, California . . . hereinafter to be known as the CREATOR of this Pure Trust Organization, and Mary Fisher of San Diego County, California, hereinafter referred to as the EXCHANGER of this Trust Organization. . . ." (D.E. 28-7 at 2.)  The purpose of the Trust is to "convey property to Trustee(s) in Trust to constitute a Pure Trust Organization for the benefit of the Certificate holders held in fee simple by the Trust for the duration hereof, and to provide for a safe, logical, and economical administration by natural and/or artificial persons or entities in a fiduciary capacity, to begin at once." (D.E. 28-7 at 3.)[3]   The trust became effective on April 8,

---

[3] Burnett argues that his children are the beneficiaries of the Investment Services Trust. (D.E. 39 at 10.) When the Government contended that the children are not and have not ever been beneficiaries of the Investment Services Trust, (D.E. 44 at 3-4) Burnett produced Investment Services Trust Certificates naming four of his children. (D.E. 46-1 at 3-6.) The United States objects to this evidence, on the grounds that these documents had not been previously produced, and that they were not properly authenticated. The United States thus requests that the documents be stricken. (D.E. 49 at 2.) Nevertheless, the Investment Services Trust Certificates, even if properly admissible, do not refute the Oxford factors as discussed herein. In fact, the Fifth Circuit has suggested in a related context that naming children as beneficiaries of a trust may actually support a finding of nominee or alter ego status. See Century Hotels v. U.S., 952 F.2d 107, 111 (5th Cir. 1992) ("[T]he record is replete with valid support for the findings that Smith controlled Crismar and that Crismar was Smith's alter ego. Taxpayer Smith was director and president or vice president of Crismar for all years but one. . . . Crismar was owned by a series of single shareholders. Since 1970, those shareholders were always relatives, family members or Smith family companies."); Id. at n.8 ("Crismar was one of 33 corporations levied on by the IRS as nominees or alter egos of Smith and his wife. . . . Until 1984, Assets Holding Corp., a Smith real estate development company, owned virtually all of the stock of the Smith family companies. Assets Holding Corp. was in turn owned by First Family Investors

2004, and Mithril Management, Inc. of Washington State was designated as the First Trustee of Investment Services.  (D.E. 28-7 at 21, 14.)[4]

On April 12, 2004, all trust certificates were surrendered by Mary Fisher, the Exchanger, to the Trustee.  Also on April 12, 2004, Burnett was appointed as the Managing Director of Investment Services. (D.E. 28-7 at 15-16.)  As Managing Director, Burnett was given broad powers to "construct, buy, sell, lease, or rent any type of real estate, improved or unimproved," and to "conduct the financial affairs of this Pure Trust Organization in any orderly manner with respect to deposits, withdrawals, loans, and escrow arrangement, and to provide mandatory and required tax information and proof of expenses," among other powers.  (D.E. 28-7 at 15.)  On May 7, 2004, Burnett received a lifetime appointment as Managing Director.  (D.E. 28-7 at 17.)  On May 8, 2004, an individual named Dane Smith was appointed by Creator Ed Clark to be the "Protector of this Pure Trust Organization."  (28-7 at 25.)

### C.    Transfer of Properties to Investment Services Trust

#### 1.    Properties at Issue

##### a.    Austin Street Property[5]

Lemmaywaynne Burnett lived on the Austin Street Property until she died.  As discussed in detail below, the Government states that Burnett entered into an agreement to sell the property to potential buyer James Hickel in 2007, and for a period before the

---

Trust. Smith was the sole trustee of First Family and his children the beneficiaries.").  Because this evidence does not significantly alter the outcome of this case, the Court need not resolve this collateral issue.

[4] According to Revenue Officer Limerick, two corporations named Mithril Management were incorporated in the State of Washington. One dissolved on October 22, 2001, and the other on October 30, 2007.  (D.E. 28-1 at 5; see also D.E. 28-12.)

[5] The "Austin Street Property" has the following legal description: "Lot Seventeen (17), Block Five (5), Alameda Place, an addition to the City of Corpus Christi, Texas, as shown on map or plat thereof, in Volume 7, page 36 of the Map Records of Nueces County, Texas."  (D.E. 28 at 9.)

sale Mr. Hickel lived on the property while paying rent to Mr. Burnett.  Mr. Hickel eventually discovered the IRS tax lien on the Austin Street Property before the sale was finalized.  (D.E. 28 at 9-10; 28-16 at 36.)

The IRS administratively seized the Austin Street Property on September 4, 2008. The initial seizure was released on December 3, 2008 to allow Hickel to submit an application for discharge of the lien, but no funds were ever submitted, and a second seizure request was made.  (D.E. 28 at 10.)  The second seizure was requested on February 13, 2009, and approved on March 2, 2009.  The property was officially seized on March 11, 2009, and on June 2, 2009, the IRS sold the property at public auction for $70,000.  (D.E. 28-1 at 3.)  After the seizure, Revenue Officer Limerick states that he began to receive correspondence from A. Michaels of Investment Services, stating that Mr. Burnett had never been a trustee, managing director, or decision maker for Investment Services.  However, upon investigation, Officer Limerick states that "no Federal ID # has been found for the trust, and no social security number was found for 'A. Michaels' who claimed to represent the Trust."  (D.E. 28-1 at 4.)

### b.    Holly Road Property[6]

Defendant Burnett lives at the Holly Road Property, and also leases portions of the property to local businesses.  One portion of the property is leased to Nueces Stone Quarry, LLC ("Nueces Stone"), owned by Swint Friday, and another portion is leased to Bill Ross, who stores tires on the property.  (D.E. 28 at 11-12; D.E. 28-14 at 21-22; D.E. 28-15 at 19-20, 27.)  According to his affidavit, Burnett's children live on the Holly Road

---

[6] The "Holly Road Property" has the following legal description: "All off [sic] Tract A and all of Tract B excepting a rectangular tract long the east line of Tract B fronting 66 feet along Holly Road and extending back there from the entire length of Tract B, Lokey Subdivision Shown on map or plat in Volume 7, page 16 of the Map Records of Nueces County, Texas."  (D.E. 28 at 11.)

Property with him, and any income derived from this property (and the Austin Street Property) is used for his children's benefit.  (D.E. 39-2 at 1-2.) [7]

### 2.      Transfer of Properties

On August 3, 2005, Burnett (who was named as attorney-in-fact for his grandmother Lemmawaynne Burnett (D.E. 28-2)) executed and recorded a deed conveying the Austin Street and Holly Road properties, previously belonging to Mrs. Burnett, to the Investment Services Trust. (D.E. 28-14 at 10-12; D.E. 28-9; D.E. 28-14 at 22.)  Lemmawaynne Burnett passed away on August 10, 2005.  (D.E. 28 at 5-6.)

Burnett was appointed executor of Lemmawaynne Burnett's estate.  (D.E. 28-6 at 16.)  As part of the probate proceedings, Burnett filed an Inventory and Appraisement and List of Claims on December 8, 2005, with the County Court at Law No. 1 of Nueces County.  The court admitted the will to probate on November 28, 2005, and approved this Inventory and Appraisement on December 14, 2005.  Neither the Austin Street Property nor the Holly Road Property were listed in the Inventory.  (D.E. 28 at 6; D.E. 28-6 at 1, 3, 6-8.)  Rather, Schedule A of the Investment Services Trust instrument lists the Holly Road and Austin Street properties as being held by the Trust.   (D.E. 28-7 at 21.) According to the United States, Investment Services possessed the Austin Street and Holly Road properties, and never filed any tax returns in relation to the properties with the IRS.  (D.E. 28 at 8-9.)

---

[7] As the United States notes in its Reply, Mr. Burnett pled the Fifth Amendment when asked in his deposition how he benefited from Investment Services, or whether it was paid to benefit his children. Nevertheless, in his Affidavit, Burnett states that "[a]ny money that has come from [the properties], has gone to support the children . . . ."  (D.E. 39-2 at 2; D.E. 44 at 4-5.)  The United States objects to this Affidavit because Mr. Burnett's deposition answers did not allow it to explore these issues in detail.  The Court need not address this issue, as usage of proceeds for his children's benefit does not negate nominee status.

### III.     Procedural Background

This action was filed by the United States on October 23, 2009 against Defendant Burnett.  (D.E. 1.)  The United States filed an Amended Complaint on November 23, 2009.  (D.E. 7.) On November 25, 2009, Defendant Burnett filed an Answer and a Counterclaim, alleging wrongful levy with respect to the Austin Street Property, pursuant to 26 U.S.C. § 7426.  (D.E. 11 at 3-4.)[8]

The United States filed this Motion for Summary Judgment on August 16, 2010. (D.E. 28.)  The United States presents four issues on summary judgment: (1) whether Burnett is liable to the United States for unpaid federal income, employment, and unemployment tax liabilities totaling over $621,623.87;[9] (2) whether the Investment Services Trust was holding the Austin Street Property and is currently holding the Holly Road Property merely as a nominee on behalf of Burnett; (3) whether the June 2, 2009 IRS sale of the Austin Street Property held by Investment Services Trust on behalf of Burnett, was appropriate under the circumstances; and (4) whether the United States may foreclose its lien on the Holly Road Property held by Investment Services Trust on behalf of Burnett.  (D.E. 28 at 1-2.)  Defendants filed a Response on September 8, 2010. (D.E. 39.)  The United States filed a Reply on September 14, 2010.  (D.E. 44.)  Burnett filed a Surreply on September 15, 2010.  (D.E. 46.)  The United States filed a Sur-surreply on September 16, 2010.  (D.E. 49.)

---

[8] Burnett had previously filed a separate lawsuit claiming that the IRS wrongfully levied on and sold the Austin Street Property.   Lemmawaynee Burnett Testamentary Trust et al v. U.S., 2:09-cv-305.   On December 9, 2009, this Court consolidated the two actions pursuant to Federal Rule of Civil Procedure 42(a).  (D.E. 21.)

[9] The Government initially stated that Burnett's tax liabilities totaled in excess of $687,000, but later amended the amount to be $621,623.87, reducing the amount to "reflect an application of the sales proceeds resulting from the IRS sale and seizure of the Austin property . . . to the initial balances due." (D.E. 29 at 1.)

IV.   **Discussion**

    A.   **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).   The substantive law identifies which facts are material.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).   A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247.   The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."   Fed. R. Civ. P. 56(e)(2); see also First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 270 (1968).   The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."   Willis v.

Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party.   Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000).

### B.    Federal Tax Assessment

The first issue on summary judgment is whether Burnett is liable to the United States for unpaid federal income, employment, and unemployment tax liabilities totaling $621,623.87.

The Government, relying upon the Declaration of IRS Revenue Officer Kevin Limerick, and Certificates of Assessments and Payments ("Form 4340") for each relevant tax year, states that it has provided sufficient proof that the notices and assessments at issue were valid and timely.  As of October 31, 2009, Defendant's total taxes, interest, and statutory additions due was $621,623.87.  As Burnett has set forth nothing to dispute this amount, the United States argues that it is entitled to judgment against Burnett for $621,623.87.  (D.E. 28 at 16; D.E. 29 at 2.)  In response, Burnett argues only that the United States has not produced IRS Form 23C signed by an Assessment Officer, and that he "never received any document(s) that assessed any taxes against [him] for any year that was signed by an IRS assessment officer."  (D.E. 39 at 8-9; D.E. 39-2 at 2.)  The United States replies that Form 23C is not necessary when the Government has submitted Form 4340 as proof of assessments.  (D.E. 44 at 1-2.)

As the Supreme Court has explained, "[i]t is well established in the tax law that an assessment is entitled to a legal presumption of correctness - a presumption that can help the Government prove its case against a taxpayer in court." United States v. Fior D'Italia Inc., 536 U.S. 238, 242 (2002); Affiliated Foods, Inc. v. C.I.R., 154 F.3d 527, 530 (5th Cir. 1998) ("The imposition of tax by the Commissioner is presumptively correct[;] therefore, the petitioner must shoulder the burden of proving that the tax assessment was improper."). This presumption extends to penalties and interest arising as a result of unpaid taxes, which are considered 'taxes' for the purposes of tax assessment under the Internal Revenue Code. 26 U.S.C. § 6665(a)(2); U.S. v. Kennedy, 2008 WL 4200780, at *2 (S.D. Tex. Sept. 9, 2008). "To rebut this presumption, the taxpayer bears the burden of proving by a preponderance of the evidence that the determination is arbitrary or erroneous." Yoon v. C.I.R., 135 F.3d 1007, 1012 (5th Cir. 1998).

"A Certificate of Assessment and Payment . . . [is] presumptive proof of a valid assessment where the taxpayer has produced no evidence to counter that presumption." U.S. v. McCallum, 970 F.2d 66, 71 (5th Cir. 1992); see U.S. v. Filson, 347 Fed. App. 987, 990 (5th Cir. 2009) (citing McCallum); Perez v. U.S., 312 F.3d 191, 195 (5th Cir. 2002) ("We held over a decade ago that, under the Federal Rules of Evidence, IRS Form 4340 constitutes valid evidence of a taxpayer's assessed liabilities and the IRS's notice thereof. There is also substantial precedent that IRS Forms 4340 and 4549 are appropriate sources evidencing the IRS's assessment and notice of tax arrears."). The Fifth Circuit in McCallum specifically rejected the argument Burnett now makes here, finding that the Government established its prima facie case by submitting Form 4340, and was not required to submit Form 23C. McCallum, 970 F.2d at 71; see Payne v. U.S., 2010 WL

2546083, at *3 (5th Cir. June 24, 2010) ("Form 4340 creates a rebuttable presumption of validity.") (citing McCallum); U.S. v. Rupe, 308 Fed. App. 777, 778-79 (5th Cir. 2009) ("Form 23C is a paper statement that contains the required assessment information and, before computerization, was used as the standard assessment record in satisfaction of IRS's statutory and regulatory obligations. . . . We agreed [in McCallum] that Form 4340 can be 'presumptive proof of a valid assessment where the taxpayer has produced no evidence to counter that presumption.'") (citations omitted).

As the United States has submitted Certificates of Assessment and Payment (D.E. 29; D.E. 29-2, 29-3, 29-4), and Burnett has offered no evidence to rebut the presumption of correctness, the Court concludes that there is no genuine issue of material fact as to the assessment of taxes.  The Court therefore grants summary judgment for the United States and finds that Burnett is liable to the United States for unpaid federal income, employment, and unemployment tax liabilities totaling $621,623.87, plus statutory additions accruing from October 31, 2009 until paid.

### C.    Investment Services as Nominee

The second issue on summary judgment is whether the Investment Services Trust is currently holding the Holly Road Property and previously held the Austin Street Property merely as a nominee on behalf of Burnett.  The Government contends that the "evidence points solely to the fact that Burnett controls this trust property just as if it was his own."  (D.E. 28 at 17.)  Burnett responds that nominee status normally requires the taxpayer to "own[] the property and then transfer[] it to another in name only in order to avoid IRS collection efforts."  Burnett argues that this factor is not present here, as he never owned the properties at issue. (D.E. 39 at 4.)  Burnett also contends that the other

factors relevant to the determination of nominee status are not present.  (D.E. 39 at 7, 10.)

Rather, Burnett argues that "[a]ll he did was transfer ownership of the properties to a

Trustee through a Power of Attorney and used and managed the property for the intended

beneficiaries – Lennawayne [Burnett's] great-grandchildren."   (D.E. 39 at 7.)   The

Government disputes this characterization and urges the Court to find nominee status.

(D.E. 44 at 2-5.)

> Title 26 U.S.C. § 6321 provides:
>
> If any person liable to pay any tax neglects or refuses to pay the same after
> demand, the amount (including any interest, additional amount, addition to
> tax, or assessable penalty, together with any costs that may accrue in
> addition thereto) shall be a lien in favor of the United States upon all
> property and rights to property, whether real or personal, belonging to
> such person.

26 U.S.C. § 6321.   "[T]he lien imposed by section 6321 shall arise at the time the

assessment is made and shall continue until the liability for the amount so assessed (or a

judgment against the taxpayer arising out of such liability) is satisfied. . . ."   Id. § 6322.

In enacting this statute, "Congress meant to reach every interest in property that a

taxpayer might have," United States v. National Bank of Commerce, 472 U.S. 713, 719

(1985) which includes "not only . . . property owned by the debtor at the time the lien

attaches, but also . . . after-acquired property until the tax liability is satisfied." In re Orr,

180 F.3d 656, 660 (5th Cir. 1999) (citing Glass City Bank v. United States, 326 U.S. 265,

267-69 (1945)).   "The Government may enforce the tax lien against any property of the

delinquent taxpayer or any property in which the taxpayer has any right, title, or interest."

U.S. v. Park Towers, Inc., 8 F.3d 306, 310-11 (5th Cir. 1993).   As discussed below,

Section 7403(c) authorizes a federal court to order the sale of property and distribute sale

proceeds in accordance with the interests of the parties.  26 U.S.C. § 7403(c).

As the Fifth Circuit has explained, "the concepts of 'nominee,' 'transferee,' and 'alter ego' are independent bases for attaching the property of a third party in satisfaction of a delinquent taxpayer's liability. A nominee theory involves the determination of the true beneficial ownership of property." Oxford Capital Corp. v. U.S., 211 F.3d 280, 284 (5th Cir. 2000). "Specific property in which a third person has legal title may be levied upon as a nominee of the taxpayer if the taxpayer in fact has beneficial ownership of the property." Id. In determining nominee status, the following factors are generally considered:

> (a) No consideration or inadequate consideration paid by the nominee; (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property; (c) Close relationship between transferor and the nominee; (d) Failure to record conveyance; (e) Retention of possession by the transferor; and (f) Continued enjoyment by the transferor of benefits of the transferred property.

Oxford, 211 F.3d at 284 n.1 (citing Towe Antique Ford Foundation v. Internal Revenue Service, 791 F. Supp. 1450, 1454 (D. Mont. 1992)).  As an initial matter, the Court rejects Burnett's alleged "foundational fact" that nominee status requires the taxpayer to "own[] the property and then transfer[] it to another in name only in order to avoid IRS collection efforts."  (D.E. 39 at 4.)  Although Burnett contends that this "foundational fact" exists in "every case surveyed," Burnett himself cites cases that lack this "fact." For example, he references United States v. Nelson, 729 F.2d 1340 (11th Cir. 1984) (D.E. 39 at 3), wherein the Eleventh Circuit affirmed the district court's ruling that the defendant's mother held title to certain real property as the defendant's nominee, even though the property was originally purchased in the mother's name, and was never directly held by defendant.  581 F. Supp. 756, 757-59 (N.D. Ga. 1982).    Moreover,

Burnett's "foundational fact" appears nowhere in <u>Oxford</u>.  While nominee status may be found when a taxpayer owns the property at issue and then transfers that property, it is incorrect to conclude that nominee status exists *only* in that situation.

The Court considers each <u>Oxford</u> factor separately.

### 1.    Consideration

The first factor looks at whether "[n]o consideration or inadequate consideration [was] paid by the nominee." <u>Oxford</u>, 211 F.3d at 284 n.1.  The Government contends that Investment Services paid no consideration for the Holly Road or Austin Street properties. (D.E. 28 at 6.)  Burnett does not provide any evidence to the contrary.  When asked in deposition whether "Investment Services pa[id] Ms. Burnett . . . for the transfer of the [Austin Street Property] to it?," Burnett responded, "I'm not sure.  I don't know how the conveyance read."  (D.E. 28-14 at 12; D.E. 28-14 at 46.)  Burnett also stated that Mrs. Burnett decided to transfer the properties to Investment Services.  (D.E. 28-14 at 14-15.)

The only evidence of any consideration being paid for the properties is the Investment Services Trust instrument itself, which provides that consideration of twenty-five dollars was given in exchange for the real properties listed in "Schedules (A, B, etc.) attached hereto."  Both the Austin Street and Holly Road properties are listed in Schedule A.  (D.E. 28-7 at 4, 21.)  Such minimal consideration, even if paid, is clearly inadequate for the transfer of these real properties.  The first factor is satisfied.

### 2.    Anticipation of Suit / Control over Property

The second consideration is whether the "[p]roperty [was] placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property."  <u>Oxford</u>, 211 F.3d at 284 n.1.

The evidence indicates that both the Austin Street and Holly Road properties were conveyed to Investment Services in August 2005.  The IRS filed its tax liens against the properties in 2001 (D.E. 28-3; D.E. 28-5), and Burnett admitted during his deposition that had he received mail from the IRS for a "number of years," possibly as early as 2001.  (D.E. 28-14 at 52-53.)   Thus, the transfers occurred after Burnett became aware of potential IRS legal action.  It therefore appears that Burnett acted in anticipation of his tax liabilities.  See Towe, 791 F. Supp. at 1457 (finding transfer in anticipation of tax liabilities because taxpayer was aware that his records were being audited at the time of the transfer).

Even after the transfer in August 2005, Burnett continued to exercise near-complete control over both properties.  With respect to the Austin Street Property, the evidence indicates that Burnett entered into an agreement for sale of the property with James Hickel in 2007.  Mr. Hickel testified that Mr. Burnett told him that "he had control of the home and he had thought about fixing it up and renting it or fixing it up and selling it."  (D.E. 28-16 at 7.)[10]  Burnett quoted Mr. Hickel a price for the property, offered to "owner finance it," and entered into a rental agreement with Mr. Hickel.  (D.E. 28-16 at 7-13.)  Rent checks were made out to Mr. Burnett, not Investment Services.  (D.E. 28-16 at 14; D.E. 28-1 at 3.)  Mr. Hickel stated that Burnett drafted the contract for deed with respect to the Austin Street property, stating a sale price of $80,000, and identifying Investment Services as the seller.  A document titled "Minutes of Investment Services," signed by A. Michaels, authorized the rental and eventual sale to Mr. Hickel.  (D.E. 39-2

---

[10] The Court finds that Mr. Burnett's out-of-court statements are competent summary judgment evidence, as they are admissible as statements against interest pursuant to Federal Rule of Evidence 804(b)(3).

at 4-7.)   The address for Investment Services, however, was listed as the Holly Road Property, upon which Burnett resided.  (D.E. 28-16 at 17; see D.E. 28-4 at 8.)

When  Hickel  eventually  discovered  that  the  contract  for  deed  was  between himself and Investment Services Trust, not Burnett, Hickel asked Burnett about the Trust. According to Hickel, Burnett stated that Investment Services "was a trust fund that was set up on his grandmother's behalf and that he was the executor of her estate and it was just a formality."  (D.E. 28-16 at 19.)  Hickel also discovered the IRS tax liens when he decided to contact a title company.  (D.E. 28-16 at 26.)  When Hickel asked to contact the Trust creator, Mr. Michaels, Burnett stated that only he could do so.  (D.E. 28-16 at 26.) Burnett explained to Hickel that rent checks should be made out to him rather than the Trust because the money collected was his "management fee."  (D.E. 28-16 at 35.) Hickel stated that he never dealt with anyone other than Mr. Burnett with respect to the Austin Street Property.  (D.E. 28-16 at 36.)  As noted above, Officer Limerick investigated but never discovered a social security number for Mr. Michaels.  (D.E. 28-1 at 3.)  When questioned about Mr. Michaels, Burnett stated that he could not recall his first name, that he had never met Mr. Michaels in person, and that he only "infrequent[ly]" talked with him on the phone.  (D.E. 28-14 at 43.)

Mr. Burnett's control over the Holly Road Property is even more apparent.  Mr. Burnett lives on the Holly Road Property and does not appear to make any rental payments to Investment Services Trust.  Officer Limerick states in his Declaration, "[b]ecause Burnett was using the Holly Street property, he should have been paying rent to the trust and in turn the trust would be required to file an income tax return to also include the rent from Hickel [on the Austin Street Property].  Yet, I found no indication

that Investment Services was filing a federal income tax return or where any proceeds of rent being paid [to] the Investment Services." (D.E. 28-1 at 3.)  Mr. Burnett stated during his deposition testimony that he lived on the property and leased a portion thereof. (D.E. 28-14 at 20-21.)

The lease agreement between Nueces Stone Quarry and Investment Services for a portion of the Holly Road Property provides that rental payments shall be made at "5631 Holly Road, Corpus Christi, Texas 78412," and "shall be made to the name of C.O. Burnett (The manager of INVESTMENT SERVICES)." (D.E. 28-10 at 1; D.E. 28-11 at 1.)  Consistent with this agreement, monthly rent checks from Nueces Stone Quarry for rent on the Holly Road Property were made out directly to Burnett. (D.E. 28-8.)

Mr. Burnett testified that he negotiated the lease agreements with Nueces Stone Quarry on behalf of Investment Services. (D.E. 28-14 at 79.)  In his deposition, Swint Friday stated that when he asked Burnett about Investment Services and ownership of the Holly Road Property, Burnett told him "I don't own the property.  It's . . . my family owns the property.  I'm one of the owners, and . . . I'm here collecting it for them and I pass their share on to them." (D.E. 28-15 at 19.)

When deposed, Mr. Burnett pled the Fifth Amendment in response to many questions regarding his use and control of the Holly Road Property, and proceeds received therefrom.  For example, Mr. Burnett pled the Fifth Amendment in response to questions regarding whether he pays rent on the Holly Road Property (D.E. 28-14 at 21, 29), makes mortgage payments (D.E. 28-14 at 29), maintains the residence (D.E. 28-14 at 30), and how he handles rent checks received from Mr. Friday and Mr. Ross. (D.E. 28-14 at 31).  It is well established that, "while a person may refuse to testify during civil

proceedings on the grounds that his testimony might incriminate him, his refusal to testify may be used against him in a civil suit." Curtis v. M & S Petroleum, Inc., 174 F.3d 661, 673-74 (5th Cir. 1999); Farace v. Indep. Fire Ins. Co., 699 F.2d 204, 210 (5th Cir. 1983). Thus, "adverse inferences" are allowed against "parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ." Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). In this case, the clear "adverse inference" from Burnett's silence in response to questions regarding his use and control over the Holly Road property is that the answers would further support the finding of "nominee" status.

The Court concludes that the evidence presented establishes that both the Holly Road and Austin Street properties were "placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continue[d] to exercise control over the property." Oxford, 211 F.3d at 284 n.1.

### 3.        Relationship between Transferor and Nominee

The third consideration is the existence of a "[c]lose relationship between transferor and the nominee." Oxford, 211 F.3d at 284 n.1. Burnett is the Managing Director of the Investment Services Trust. As noted above, the Managing Director has broad powers, namely:

> the power . . . to construct, buy, sell, lease or rent any type of real estate, improved or unimproved; advertise different articles or business projects; borrow money for the project, pledging Trust Organization property for the payment thereof, hypothecate assets, property, or both; own stock in or entire charters of corporations, or other properties, companies or associations as he/she may deem advantageous; may buy, sell, or hypothecate any or all assets of the Pure Trust Organization; open and maintain one or more checking, savings, or other thrift accounts in the name of this Trust in any financial institutions as he/she may deem advantageous; and in general conduct and operate the trust business.

(D.E. 28-7 at 15.)    Thus, Burnett plays a significant role as Managing Director of Investment Services, similar to that played by a trustee.   See, e.g., Trusts: Powers of Trustee, Tex. Prop. Code §§ 113.008 (investment in businesses); 113.009 (real property management); 113.010 (sale of property). Moreover, when asked about his relationship with Investment Services, Burnett often pled the Fifth Amendment.   For example, Burnett pled the Fifth Amendment when asked about how he interacts with the trustee, or how money is received from the Trust, whether he was benefiting from the trust, and who signed checks received from Investment Services. (D.E. 28-14 at 25; 83-85.)  As noted above, "adverse inferences" are allowed against "parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ."  Baxter, 425 U.S. at 318.   The adverse inference to be drawn is that Mr. Burnett has a very close relationship with Investment Services Trust.

In light of these considerations, the Court finds that there is no genuine issue of material fact as to the nature of Burnett's relationship with Investment Services Trust.

### 4.    Failure to record conveyance

The fourth factor asks whether the conveyance of the property at issue was recorded.  Oxford, 211 F.3d at 284 n.1.   Here, the Government concedes that the conveyances of the Holly Road and Austin Street properties were recorded.  (D.E. 28 at 19.)  Although this factor does not favor a finding of nominee status, no one factor is determinative.  See, e.g., U.S. v. Evseroff, 2003 WL 22872522, at *9 (E.D.N.Y. Sep. 30, 2003) ("In determining whether a third-party holds property as a nominee . . ., courts have considered, inter alia, the following non-exclusive factors. . . ."); Turk v. I.R.S., 127

F. Supp. 2d 1165, 1167 (D. Mont. 2000) ("No factor can dispose of the [nominee] issue by itself, and no factor is necessarily required in order to find nominee status.").

> 5.     **Enjoyment of Property**

The final consideration is whether the transferor continued to "enjoy[] . . . the benefits of the transferred property."  Oxford, 211 F.3d at 284 n.1.  This factor has been addressed to a considerable degree in the Court's discussion of the second Oxford factor.

With respect to the Holly Road Property, Burnett lives on the property, does not pay rent or otherwise compensate Investment Services for his use and enjoyment of the property, and continues to collect rent from Swint Friday of Nueces Stone Quarry and Billy Ross.  (See supra Part IV.C.2.)

With respect to the Austin Street Property, Burnett dealt with Hickel to negotiate the rental and eventual sale of this property.  As noted above, Hickel testified that he worked only with Burnett, and no one else from the Investment Services Trust.  Burnett received rent checks from Hickel, and at all times during the negotiations with Hickel for the sale of the Austin Street Property, Burnett acted as if he owned the property.  (See supra Part IV.C.2.)

There is no issue of material fact as to Burnett's continued enjoyment of the benefits of both properties after their transfer to Investment Services.

In sum, four of the five non-exhaustive factors clearly support the conclusion that Investment Services holds the Holly Road Property, and previously held the Austin Street Property, as a nominee for the benefit of Burnett.  As such, the United States is entitled to enforce its federal tax liens against both properties.

### D.    Burnett's Claim for Wrongful Levy

The third issue on summary judgment is whether the IRS wrongfully seized and sold the Austin Street Property on June 2, 2009, as Burnett alleges in his counterclaim brought pursuant to 26 U.S.C. § 7426.  (D.E. 11 at 2-4.)

Title 26 U.S.C. § 7426 provides:

> If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

26 U.S.C. § 7426.  "The elements of a wrongful levy action under section 7426 are well settled."  Oxford Capital Corp., 211 F.3d at 283.  "[T]o establish a wrongful levy claim a plaintiff must show (1) that the IRS filed a levy with respect to a taxpayer's liability against property held by the non-taxpayer plaintiff, (2) the plaintiff had an interest in that property superior to that of the IRS and (3) the levy was wrongful. To prove that a levy is wrongful, (1) a plaintiff must first show some interest in the property to establish standing, (2) the burden then shifts to the IRS to prove a nexus between the property and the taxpayer, and (3) the burden then shifts back to the plaintiff to prove the levy was wrongful, e.g., that the property in fact did not belong to the taxpayer."  Id. (internal citations omitted).

The United States contends that Burnett, in his capacity as Trustee of the Lemmawaynne Burnett Testamentary Trust and/or Next Friend of his minor children, lacks standing to bring a wrongful levy claim.  Further, the IRS properly investigated the Austin Street Property, and found that Burnett exercised active and substantial control

over the property.  As such, Burnett has not put forth sufficient evidence to withstand summary judgment on this claim.  (D.E. 28 at 20-22; see also D.E. 44 at 6-7.)

Burnett responds that the Government's nominee theory is flawed because it has been applied only when the taxpayer first owns the property at issue, then transfers it to another person to avoid IRS collection efforts.  As this element does not exist here, the Government's levy of the Austin Street property on a nominee theory cannot succeed.  (D.E. 39 at 4-7.)  Burnett contends that the Government cannot meet its burden to establish a "substantial nexus" between the Austin Street Property and himself.  (D.E. 39 at 10.)  He also contends that he has standing to bring this wrongful levy action because he represents the trust beneficiary minor children.  (D.E. 39 at 11.)  Finally, Burnett argues that he could not have transferred the properties at issue to himself as attorney-in-fact, as Texas law prohibits a fiduciary from doing so.  (D.E. 39 at 11-12.)

The first consideration in a wrongful levy action is whether a party claiming wrongful levy has standing.  Oxford, 211 F.3d at 283 ("To prove that a levy is wrongful, a plaintiff must first show some interest in the property to establish standing.")  Burnett claims that he has standing in his capacity as Trustee of the Lemmawaynne Burnett Testamentary Trust and/or Next Friend of his minor children.  (D.E. 39 at 11.)  Burnett's own complaint and deposition testimony clearly establishes, however, that the Lemmawaynne Burnett Testamentary Trust never held title to the Austin Street Property. Rather, on August 3, 2005, Burnett, as attorney-in-fact for Lemmawaynne Burnett, transferred the Austin Street Property out of Mrs. Burnett's name and into the Investment Services Trust.  (2:09-cv-305, D.E. 1 at 3; see also 28-1 at 2.)  Burnett admitted that the property was transferred to the Investment Services Trust "at Mrs. Burnett's request."

(D.E. 28-14 at 12.)  Burnett also stated that prior to the IRS sale of the Austin Street Property, the Investment Services Trust owned that property. (D.E. 28-14 at 18-19.)   As the Austin Street Property was no longer part of Lemmawaynne Burnett's probate estate when she died on August 10, 2005, it could not have passed to her Testamentary Trust. See Texas Probate Code § 3(l) ("'Estate' denotes the real and personal property of a decedent, both as such property originally existed and as from time to time changed in form by sale, reinvestment, or otherwise, and as augmented by any accretions and additions thereto . . . and substitutions therefor, and as diminished by any decreases therein and distributions therefrom."); Restatement (Third) of Property (Wills & Don. Transfers) § 1.1(a) ("The probate estate consists of property owned by the decedent at death and property acquired by the decedent's estate at or after the decedent's death."). In fact, the Inventory and Appraisement and List of Claims filed by Burnett in Lemmawayne Burnett's probate action lists neither the Holly Road Property nor the Austin Street Property as part of the estate.  (D.E. 28-6 at 6-7.)  Mr. Burnett swore that this listing was "a true and complete statement of the property and claims of the estate of Lemmawayne Burnett that have come to [his] knowledge."  (D.E. 28-6 at 8.)

Because the Austin Street Property was transferred to the Investment Services Trust prior to Mrs. Burnett's death, it was not part of her estate, and Burnett, as Trustee of the Lemmawaynne Burnett Testamentary Trust and/or Next Friend of his minor children, has no standing to assert a wrongful levy claim.

In any event, even if Burnett had standing either to sue in his individual capacity or as Trustee, Burnett could not establish that the levy was "wrongful."  As discussed above, the evidence establishes a "nexus" between the Austin Street Property and

Burnett, namely that it was held by Investment Services as a nominee for Burnett.  Levy of the property due to Burnett's tax liabilities was therefore proper.[11]

As Burnett lacks standing to assert a wrongful levy claim with respect to the Austin Street Property pursuant to 26 U.S.C. § 7426, his claim must be dismissed.[12]

### E.      Sale and Execution of Liens against Properties

The United States seeks an order pursuant to 26 U.S.C. § 7403 to "enforce its tax [liens] by foreclosing upon and selling the Holly Road property."  (D.E. 1 at 6.)  Because the United States holds a valid tax lien on the Holly Road Property as discussed above, "it should be entitled to seek an order allowing it to enforce such liens against the property."  (D.E. 28 at 24.)

Title 26 U.S.C. § 7403(a) provides:

> In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability. For purposes of the preceding sentence, any acceleration of payment under section 6166(g) shall be treated as a neglect to pay tax.

---

[11] Burnett argues that "the only evidence that the government can use to support its claim of a nexus between the property levied upon and the taxpayer by substantial evidence are those statements contained in" IRS Agent Limerick's June 28, 2007 report.  (D.E. 39 at 13.)  This argument is presumably related to Burnett's argument in his Motion to Strike Summary Judgment Evidence.  (D.E. 38.)  As the Court has explained, Oxford does not prevent the government from gathering and presenting evidence to support its levy to defend itself against a wrongful levy claim.  (See D.E. 40 at 2.)

[12] Burnett also states in his Response, "[a] remaining claim is that the IRS failed to accept the highest bid." (D.E. 39 at 12.)   Burnett does not include this claim in his counterclaim.  (D.E. 11.)  On September 8, 2010, Burnett attempted to amend his complaint "to make a more specific allegation that the auction conducted by the IRS was wrongful in that the IRS agent conducting the [auction] failed to accept the highest bid."  (D.E. 36.)  The Court denied Burnett's motion to amend his complaint.  (D.E. 40 at 1-2.) This claim will not be considered.

26 U.S.C. § 7403(a).  This provision applies even if the property can be considered a homestead pursuant to Texas law.  U.S. v. McMahan, 2008 WL 5114651, at *6 (S.D. Tex. Dec. 8, 2008) (citing U.S. v. Rodgers, 461 U.S. 677, 690-94 (1983)).

> Title 26 U.S.C. § 7403(c) provides:
>
> The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States. . . .

26 U.S.C. § 7403(c).  As discussed above, the United States holds a valid federal tax lien on the Holly Road Property, and recorded this lien in the real property records of Nueces County on February 8, 2001.  Burnett has failed to provide any convincing arguments opposing foreclosure.  Consistent with 26 U.S.C. § 7403, the United States is entitled to foreclose its federal tax lien against the Holly Road Property, and apply the proceeds from the sale to Burnett's tax debt.  See 26 U.S.C. § 7403(c).

## V.   Conclusion

For the reasons stated above, United States of America's Motion for Summary Judgment is GRANTED.  (D.E. 28.)  The Court ORDERS as follows:

(1) Judgment is entered in favor of the United States and against Charles O. Burnett III in the amount $621,623.87 plus statutory additions accruing from October 31, 2009 until paid, for Burnett's 1993-1997 income tax liabilities, 1995-1997 federal employment tax liabilities, and 1995-1997 federal unemployment tax liabilities.

(2) The United States, in aid of its collection of Burnett's tax liabilities, may foreclose its tax lien against Burnett's real property pursuant to 26 U.S.C. § 7403, located in Nueces County, Texas, such property having the following legal description: "All off [sic] Tract A and all of Tract B excepting a rectangular tract long the east line of Tract B fronting 66 feet along Holly Road and extending back there from the entire length of Tract B, Lokey Subdivision Shown on map or plat in Volume 7, page 16 of the Map Records of Nueces County, Texas."

(3) Defendant-Counter-Plaintiff Charles O. Burnett III's wrongful levy claim pursuant to 26 U.S.C. § 7426 is hereby DISMISSED.

(4) Within one week of the date of this Order, the United States shall file a verified supplemental schedule of the statutory additions accruing to Burnett's tax liability since October 31, 2009, and shall propose a form of Order upon which Final Judgment may be entered detailing the conditions of the foreclosure sale and the division of proceeds therefrom.

SIGNED and ORDERED this 7th day of October, 2010.

_____
Janis Graham Jack
United States District Judge